PER CURIAM.
B.W., Mother of T.G., Jr., A.H., and C.H., Children, [“Mother”] appeals an order entitled “ORDER GRANTING STATE’S MOTION FOR REUNIFICATION OF [A.H.] and [C.H.] ONLY, AND CLOSING CASE AS TO [T.G., JR.], WITH HIS FATHER.” Mother contends that the trial court erred by placing T.G., Jr., into the custody of T.G., Sr. [“Father”] and closing the case because she had substantially complied with her case plan and there was insufficient evidence to establish that reunification of T.G., Jr., with her would be detrimental to T.G., Jr.
On September 15, 2011, the Department of Children and Families [“DCF”] filed a dependency shelter petition, requesting an order of shelter for A.H., C.H., and T.G., Jr., after receiving a report that C.H. had marks and scars, and that Mother and her paramour, Máxime Milford “[Milford”][1] hit C.H. According to the petition, A.H. and C.H. share the same father, T.G., Jr., has a different father (T.G., Sr.), and Milford is the father of a fourth child, S.M., a child for whom DCF was not seeking shelter. DCF asserted that it had conducted interviews with C.H. and A.H.; that “[b]oth children stated that the form of discipline in the home [was] that they [were] whooped on the butt with a belt by Max;” and that T.G., Jr., and C.H. were beaten more often. C.H. was examined by the Child Protection Team [“CPT”] and physical abuse was confirmed.
CPI Simpson contacted the Orlando Police Department and filed a child abuse report against Milford:
At this time Mr. Milford is on home confinement at the mother’s home. There were concerns about Mr. Milford being bonded out to the home and the other children remaining in the home with verified physical injuries regarding [C.H.]. CPI Simpson Safety Planned with the mother and Mr. Milford for the children to remain out [sic] the home until Mr. Milford was able to change his home confinement address and/or services could be placed in the home. However, the mother continued to allow [T.G., Jr.] and [A.H.] to frequent the home while Mr. Milford was in the home despite being aware of the nature and extent of [C.H.’s] injuries and being aware that the paramour had been criminally charged with Child Abuse.
The mother and Mr. Milford have a child in common that remains in the home ... [S.M.]. At this time there is no concern for her remaining in the home as the non-biological children appear to be the target children. The *245 maternal relatives and the children’s father have stated concerns about the children remaining in the home with Mr. Milford. There is concern over Mr. Milford’s aggression towards the non-biological children and the mother. The mother has been observed with marks and bruises due to possible domestic violence with Mr. Milford. The children have expressed fear to family members about being in the home with Mr. Milford. The eldest children have informed family members that they are undressed and spanked while bending over the bed. The mother has been provided VPS services in prior cases.
The Department cannot ensure the children’s safety while in the care of the mother as she failed to comply with recommended action to ensure the safety of her children. The mother has continued to allow the paramour access to the children despite the physical abuse to [C.H.] which has resulted in a criminal charge of child abuse. The Department is respectfully requesting that probable cause be found on behalf of the children and that they be sheltered and placed in the Department’s care.
The trial court ordered T.G., Jr., placed with his father [“Father”], and placed A.H. and C.H. with their paternal grandparents. In the order, the trial court found that Mother had disregarded the Safety Plan, bonded her paramour out of jail, and continued to expose the children to the paramour. The trial court directed that Milford was to have no contact with the children.
Subsequently, on October 3, 2011, after conducting a hearing, the trial court entered an order of arraignment, as well as an order of adjudication, disposition, acceptance of case plan, and notice of hearing. In the order of arraignment, the trial court noted that Mother and the father of A.H. and C.H each consented to dependency, and that there were no allegations with respect to the father of T.G., Jr. [Father],
In the order of adjudication, disposition, acceptance of case plan, and notice of hearing, the trial court adjudicated A.H. and C.H. dependent, and placed them in the temporary custody of their paternal grandparents. With respect to T.G., Jr., the trial court withheld adjudication and continued T.G., Jr.’s, placement with Father. The trial court also accepted DCF’s case plan, the permanency goal of which was “Reunification with Parent with an expiration. date of 06-15-2012.” In a separate order, the trial court appointed a guardian ad litem.
On December 9, 2011, DCF filed a judicial review social study/case plan update, which reported that Mother had substantially complied with her case plan task of participating in domestic violence counseling, but had only partially complied with her case plan task of attending a twelve-week parenting class.
On March 8, 2012, a general magistrate, after conducting a status compliance hearing, filed findings and a recommendation, including in part:
Mother’s compliance: Mother maintains that she has reached substantial compliance having completed domestic violence, separated from her paramour, maintaining stable housing and income. Mother is requesting a home study.
The general magistrate directed that a home study be performed on Mother. The trial court entered an order ratifying and approving the report and recommendation of the general magistrate.
On May 7, 2012, a status report of the case manager was filed with the trial court. In the report, the case manager provided:
*246 Attached is a home study recommending reunification of the following children: [C.H.] and [A.H.]
It is being recommended that the third child above, [T.G., Jr.], be allowed by the Court to continue living in the home of his father.... Rationale for this recommendation is as follows:
[T.G., Jr.] is currently placed in the home of his father, ... has been with his father since the date of removal and has been doing extremely well in his current placement. Upon his arrival at his father’s home, [T.G., Jr.] displayed concerning behaviors and an intense fear of adult males; it is believed that this fear is the result of the abuse that the children allegedly suffered at the hands of the mother’s paramour. In the time that has transpired, [T.G., Jr.] has worked with a therapist and has been successfully discharged from therapy due to his behaviors subsiding and his thriving in the home of the father. The father and mother both report a healthy relationship where they work together to parent their child. The father reports having no issues with allowing the mother to be an integral part of the child’s life however, the father has expressed concern regarding the environment that his child was exposed to as a result of the mother’s negligence in the past.
There is a concern that [C.H.] and [A.H.] may need time to adjust to their new placement with the mother and that between the two children being reunified, the infant in the home, and the child that has yet to be born, the mother will have multiple stressors in her life. The father has expressed a legitimate concern (and the Department shares the concern) that five children in this household may be unmanageable both emotionally and financially.
It is believed that uprooting [T.G., Jr.] from his current home with his parent, [T.G., Sr.], would be extremely detrimental to this child and to the prospect of a successful reunification with the children [C.H.] and [A.H.]. In an effort to make this reunification as successful as possible with the children [C.H.] and [A.H.], it is strongly recommended that [T.G., Jr.] be allowed to stay in the home with his father permanently and that his mother maintain her right to unsupervised visits with her child while providing a home for her four other children.
Also, it is believed that it would be detrimental to the family system to suggest that this non-offending father will only be afforded his fundamental right to care for and live with his son for several months while the mother rectifies a situation that never should have happened in the first place. The mother has previously put this child at risk and has admitted that she continued to expose this child to the same level of risk knowingly without pursuing help for her children prior to removal.
Devereux requests at this time that the Court issue a self-executing order stating that upon four (4) successful weekend overnight visits that the children [C.H.] and [A.H.] be reunified with their mother.
Devereux requests at this time that the Court issue an order placing the child [T.G., Jr.] in the home of his father, [T.G, Sr.] and that [T.G., Jr.’s] case be closed out to this father, [T.G., Sr.].
Devereux requests at this time that the Court issue a self-executing order that states upon four (4) successful weekend overnight visits that the child [T.G., Jr.] be allowed UNSUPERVISED OVERNIGHT CONTACT with the mother, [B.W.].
*247 In the parental reunification readiness assessment and home study, attached to the case manager’s report, the case manager wrote in part: “The mother reports that she and the alleged perpetrator (Máxime Milford) are no longer in a romantic relationship despite the fact that she has a child with him and another one on the way.”
On the same day, May 7, 2012, DCF filed a motion for reunification of A.H. and C.H., only, and closing case as to T.G., Jr. with his father. It alleged:
3. The mother has substantially complied with her case plan, and requested reunification. Devereux Florida has completed a home study on the mother’s home and it is positive for reunification of [C.H.] and [A.H.]. (see attached Home Study).
4. Therefore, the State is requesting the court grant an order to reunify the minor children, [A.H.] and [C.H.], with their mother.
5. However, Devereux Florida does not recommend reunification of the child [T.G., Jr.]. The State believes that between [C.H.] and [A.H.], [S.M.] (an 11 month old of whom the mother did not lose custody), and the mother’s soon-to-be born child, the mother will have multiple stressors both financially and emotionally. (See attached Status Report).
6. The addition of a fifth child, [T.G., Jr.], who is only 2 years old, is an unnecessary stressor. [T.G., Jr.] is thriving in his father’s care, after completing therapy for an intense fear of adult males. The father and mother both report a healthy relationship where they work together to parent their child.
7. The State requests a self-executing Order which will reunify [A.H.] and [C.H.] with their mother, and grant unsupervised visitation for the mother with [T.G., Jr.], after four (4) successful overnight weekend visits. (See attached Status Report).
8.The State also requests the Court enter an Order placing [T.G., Jr.] in the permanent custody of his father, and closing his case.
On May 15, 2012, DCF filed a status report, to which it attached a treatment update for Milford, consisting of a letter from a licensed psychotherapist reporting that he “administratively discharge[ed] him due to non-compliance to treatment.”
The trial court conducted a hearing on May 16, 2012. At the outset of the hearing, the trial court inquired about the position of the parties regarding DCF’s motion for reunification of A.H. and C.H. only, and closing the case with respect to T.G., Jr., with his father. Counsel for DCF replied: “The reason we are before you is because the mother is objecting to the non-return of [T.G., Jr.], and that is the only issue.” The Guardian ad Litem asserted: “Your Honor, we think it’s in the best interests of [T.G., Jr.], to be with his father at this time.”
Upon inquiry by the trial court about whether Mother had a case plan at the then present time, counsel for DCF replied:
She does, Your Honor. And she has — I have additional information that — and reasons why, even if we were to follow this case — that I believe that it’s detrimental to this child to return him to his mother.
[[Image here]]
The specifics of this case: Mom has substantially complied. The reason the children were taken is because the mother’s paramour, who is the father of her two younger children, a newborn who was just born last week and a toddler — ....
[[Image here]]
*248 So we have a one-year-old and a newborn — are the children of the paramour who was responsible for the abuse of the three children that were removed.
And so our position is that — regardless of the fact that the court reserved ruling, is that ... [A.H.] and [C.H.] are seven and five, approximately, give or take a month here or there in this new year. Seven and five, they’re verbal and are able to report if someone is to do something — because we are under the assumption that this — he’s not just a paramour anymore. He’s the father of two of her children.
He had voluntarily said that he would do a case plan which included counseling and behavior education regarding his issues. He’s been discharged from that program and they’ve had no further contact with him. So he did not do what we would have hoped he would have done to resolve that.
[[Image here]]
We believe [A.H.] and [C.H.] can report if something happens. [T.G., Jr.] is just turning three and he is speech-delayed. He’s not extremely verbal.
And we believe that given the two children she’s getting back and the newborn and one-year-old she has in the home, that [T.G., Jr.] is not able to protect himself and that it could be detrimental to him to put him back in this home where we believe this person is still going to be present.
Counsel for Mother asserted:
The mother and the paramour at this time, they are not a couple. Yes, they do share children together, and they will continue to do that until whenever. But they are not actively a couple. They do not live together. The only thing that they share right now in common are the two children that they have together.
Upon inquiry by the trial court about whether the Guardian ad Litem “believe[d] reunification with mother would be detrimental to the child,” the Guardian ad Li-tem responded affirmatively:
Our main concern is the fact that there will be contact with the paramour if the child is returned to the mother, and the fact that he is not yet three years old so he won’t be able to report as [A.H.] and the other son will be able to do. And even though I understand that they’re not in a romantic relationship, I echo the court’s concern that the probability that there will be contact with the paramour with — if [T.G., Jr.] is in the house, is very high. She just had a baby, and there is a one-year-old.
And certainly, she seems to be a young lady who takes into consideration that there should be some relationship between her children and their fathers, so the probability of contact with [T.G., Jr.], and the father — and the paramour — excuse me — is very high, and it’s concerning us regarding whether or not he will be safe.
So it is our position that at this time, particularly since she just had the baby, that it would, in effect, endanger [T.G., Jr.], to be returned at this time. He can’t fend for himself and he can’t report anything that’s happening in the house because he’s non-verbal.
On June 13, 2012, the trial court, entered the order granting DCF’s motion for reunification of A.H. and C.H. only, and closing the case as to T.G., Jr., with his father. It provided:
1. At Disposition on October 3, 2011, the Court reserved ruling on ... [T.G., Jr.’s] Father’s Motion to Terminate Supervision and Jurisdiction.
2. [T.G., Jr.’s Father] has had custody of his child, [T.G., Jr.], since shelter on September 15, 2011.
*249 3. The mother has substantially complied with her case plan.
4. The mother’s paramour, who caused injury to the children resulting in the shelter, has not engaged with voluntary services.
5. Although the mother asserts she and the paramour are no longer involved in a romantic relationship, the mother and paramour have had two children together, who live with the mother.
6. There is a likelihood that [A.H.], [C.H.], and [T.G., Jr.] will continue to be exposed to the paramour.
7. Due to his age and limited verbal ability, [T.G., Jr.] is not sufficiently able to self-report fear of or abuse by the paramour.
8. There is a sufficient showing that reunification of [T.G., Jr.] with the mother would be detrimental to the child. See M.M. v. DCF, 29 So.3d 1200 (Fla. 5th DCA 2010).
9. Had the Court known in October, 2011, the facts of which it is now aware, including that the paramour has not engaged with services, the Court would have granted the father’s Motion to Terminate Supervision and Jurisdiction made at Disposition.
Therefore, it is hereby ORDERED AND ADJUDGED:
1. [T.G., Jr.’s] ... Father’s Motion to Terminate Supervision and Jurisdiction, made at the Disposition on October 3, 2011, is GRANTED.
2. The State’s Motion for Reunification of [A.H.] and [C.H.] with the mother is GRANTED, after four successful consecutive unsupervised weekend visits, pursuant to this Court’s previous Order.
On appeal, Mother contends that, because she had substantially complied with her reunification case plan, she was entitled to have T.G., Jr., returned to her, unless adequate findings of fact establishing that reunification would be detrimental to the child were made and were based on competent evidence. See D.G., v. Dep’t of Children & Families, 903 So.2d 1042 (Fla. 5th DCA 2005). DCF, on the other hand, urges that the facts on which the trial court relied were not in dispute. In the main, DCF is correct, although it appears that the likelihood of T.G., Jr.’s, future exposure to Milford is contested by Mother. In the past, Mother has demonstrated an unwillingness to protect her children from abuse at the hands of Milford or from exposure to her own abuse by Milford. Nevertheless, where an offending parent in the position of the mother in this case contests the issue of “detriment to the child,” and one or more facts are in dispute, an evidentiary hearing must be held at which both sides can adduce evidence, and adequate findings must be made to support a finding that return of the child to the mother would be detrimental.
Here, the trial court acknowledged during the hearing that there were factual issues, including the risk of future harm to T.G., Jr., if he were returned to Mother. Nevertheless, the court made findings of fact without conducting an evidentiary hearing. Accordingly, we are bound to reverse and remand for that purpose.
REVERSED and REMANDED.
ORFINGER, C.J. GRIFFIN and SAWAYA, JJ., concur.

. It is unclear from the record whether the paramour's last name should be spelled "Mi-lord" or "Milford.”